**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOFIQ NASSER AWAD AL-BIHANI | ) |
| | ) |
| | ) |
| *Petitioner*, | ) |
| | ) |
| v. | ) Case No. 1:22-cv-02845-RBW |
| | ) |
| JOSEPH R. BIDEN, JR., *et al.*, | ) |
| | ) |
| *Respondents*. | ) |
| | ) |
| | ) |

**RESPONDENTS' RETURN TO**
**PETITION FOR WRIT OF HABEAS CORPUS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 5

ARGUMENT ................................................................................................................... 9

I.     PETITIONER'S DETENTION REMAINS LAWFUL BECAUSE THE
HOSTILITIES AUTHORIZED BY THE 2001 AUMF REMAIN ONGOING ............... 9

       A.     The AUMF Authorizes the Use of Force Against al-Qaida and Associated
Forces; Such Authorization is Not Geographically Limited to Afghanistan. ......... 9

       B.     Whether an Armed Conflict has Ended is a Question On Which Courts
Defer to the Political Branches ............................................................................ 13

       C.     Respondents' Ongoing Actions Against Al-Qaida and Associated Forces
Reflect the Scope of the Authority Conferred by the AUMF .............................. 17

       1.     Throughout the Conflict, Hostilities Against Al Qaida and Associated
Forces Have Extended Far Beyond Afghanistan. .................................................. 17

       2.     Hostilities Against Al-Qaida and Associated Forces Remain Ongoing. .............. 20

II.    THE 2006 MILITARY COMMISSIONS ACT FORECLOSES PETITIONER
FROM INVOKING THE THIRD GEVENA CONVENTION, AND HE
CANNOT INVOKE IT INDIRECTLY THROUGH ARMY REGULATION 190-
8 ................................................................................................................................ 26

       A.     Detention Operations at Guantanamo Bay Are Exempt From Army
Regulation 190-8 Under the Exception Memorandum. ........................................ 27

III.   THE LEGALITY OF PETITIONER'S DETENTION IS NOT UNDERMINED
BY  THE TASK FORCE'S DESIGNATION OF CERTAIN YEMENI
DETAINEES FOR CONDITIONAL DETENTION ...................................................... 35

CONCLUSION ............................................................................................................... 38

# TABLE OF AUTHORITIES

**CASES**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ........................................................................ 1

*Ahjam v. Obama*,
  37 F. Supp. 3d 273 (D.D.C. 2014) ................................................................... 36

*Air Transp. Ass'n of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999) ............................................................................. 36

\* *Al-Alwi v. Trump*,
  901 F.3d 294 (D.C. Cir. 2018) .......................................................... 13, 14, 15, 17

\* *Al-Bihani v. Obama*,
  590 F.3d 866 (D.C. Cir. 2010) ............................................................ 3, 14, 23, 26

\* *Al-Bihani v. Obama*,
  2010 U.S. Dist. LEXIS 107590 (D.D.C. Sept. 22, 2010) ................................ *passim*

*Al-Bihani v. Obama*,
  2011 U.S. App. LEXIS 2600 (D.C. Cir. Feb. 10, 2011) ........................................ 6

*Al-Bihani v. Obama*,
  2012 U.S. LEXIS 4337 (June 11, 2012) ............................................................. 6

*Al-Qahtani v. Trump*,
  443 F. Supp. 3d 116 (D.D.C. 2020) ............................................................ 32, 33

*Al-Wirghi v. Obama*,
  54 F. Supp. 3d 44 (D.D.C. 2014) ..................................................................... 37

\* *Al Hela v. Trump*,
  972 F.3d 120 (D.C. Cir. 2020) ........................................................................ 19

\* *Al Warafi v. Obama*,
  716 F.3d 627 (D.C. Cir. 2013) ................................................................... 33, 34

\* *Ali v. Obama*,
  736 F.3d 542 (D.C. Cir. 2013) ................................................................ 1, 2, 19

*Alliance for Natural Health v. Sebelius*,
  775 F. Supp. 2d 114 (D.D.C. 2011) ................................................................. 36

*Almerfedi v. Obama*,
  654 F.3d 1 (D.C. Cir. 2011) ........................................................................... 37

* *Awad v. Obama,*
    608 F.3d 1 (D.C. Cir. 2010) .......................................................................... 5, 37

*Baker v. Carr,*
    369 U.S. 186 (1962) ........................................................................................ 16

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ........................................................................................ 18

*Center for Nat. Sec. Studies v. U.S. Dep't of Justice,*
    331 F.3d 918 (D.C. Cir. 2003) ........................................................................ 16

*Chen Zhou Chai v. Carroll,*
    48 F.3d 1331 (4th Cir. 1995) .......................................................................... 36

*Chevron Oil Co. v. Andrus,*
    588 F.2d 1383 (5th Cir. 1979) ........................................................................ 28

*Citizens Protective League v. Clark,*
    155 F.2d 290 (D.C. Cir. 1946) ........................................................................ 15

*Commercial Trust Co. of New Jersey v. Miller,*
    262 U.S. 51 (1923) .......................................................................................... 15

*Communities Against Runway Expansion, Inc. v. FAA,*
    355 F.3d 678 (D.C. Cir. 2004) ........................................................................ 36

*Defenders of Wildlife v. Jackson,*
    791 F. Supp. 2d 96 (D.D.C. 2011) .................................................................. 36

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) ........................................................................ 16

*Facchiano Constr. Co. v. U.S. Dep't of Labor,*
    987 F.2d 206 (3d Cir. 1993) ............................................................................ 36

*Fla. Bankers Ass'n v. U.S. Dep't of Treasury,*
    19 F. Supp. 3d 111 (D.D.C. 2014) .................................................................. 36

* *Gul v. Biden,*
    2021 WL 5206199 (D.D.C. Nov. 9, 2021) ...................................................... 3, 17

* *Hamdan v. Rumsfeld,*
    415 F.3d 33 (D.C. Cir. 2005), *rev'd on other grounds*, 548 U.S. 557 (2006) ................... 30, 32

* *Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006) ........................................................................................ 29, 30, 32

\* *Hamdi v. Rumsfled,*
   542 U.S. 507 (2004) ................................................................. 1, 12, 13

*Hamdi v. Rumsfeld,*
   337 F.3d 335 (4th Cir. 2003) ............................................................. 16

*Hamilton v. Ky. Distilleries & Warehouse Co.,*
   251 U.S. 146 (1919) ........................................................................ 22

*Heggestad v. U.S. Dep't of Justice,*
   182 F. Supp. 2d 1 (D.D.C. 2000) ..................................................... 28

*Helicopter Ass'n Int'l, Inc. v. FAA,*
   722 F.3d 430 (D.C. Cir. 2013) .......................................................... 36

\* *Husayn v. Austin,*
   2022 WL 2093067 (D.D.C. Jun. 10, 2022) ............................... 3, 13, 17

*In re Surface Mining Regulation Litig.,*
   627 F.2d 1346 (D.C. Cir. 1980) ........................................................ 36

*Indep. Meat Packers Ass'n v. Butz,*
   526 F.2d 228 (8th Cir. 1975) ............................................................ 36

*Knight v. United Land Ass'n,*
   142 U.S. 161 (1891) ........................................................................ 28

\* *Ludecke v. Watkins,*
   335 U.S. 160 (1948) ............................................................... 13, 14, 15

*Maqaleh v. Hagel,*
   738 F.3d 312 (D.C. Cir. 2013) .......................................................... 13

*Meyer v. Bush,*
   981 F.2d 1288 (D.C. Cir. 1993) ........................................................ 36

*Morrow v. Clayton,*
   326 F.2d 36 (10th Cir. 1963) ............................................................ 28

\* *Paracha v. Biden,*
   2022 WL 2952493 (D.D.C. Jul. 26, 2022) ................................ 3, 17, 37

*Res. Def. Council v. U.S. Dep't of State,*
   658 F. Supp. 2d 105 (D.D.C. 2009) .................................................. 36

*The Prize Cases,*
   67 U.S. (2 Black) 635 (1862) ............................................................ 13

*The Protector,*
  79 U.S. 700 (1871) ......................................................................................... 14

*The Three Friends,*
  166 U.S. 1 (1897) ........................................................................................... 15

*United States ex rel. Accardi v. Shaughnessy,*
  347 U.S. 260 (1954) .................................................................................. 4, 35

*United States v. Anderson,*
  76 U.S. 56 (1869) .................................................................................... 14, 16

*United States v. Hamidullin,*
  888 F.3d 62 (4th Cir. 2018) ........................................................................... 32

*United States v. Hennis,*
  75 M.J. 797 (A. Ct. Crim. App. 2016), *aff'd*, 79 M.J. 37 (C.A.A.F. 2020) ........... 28

*Warafi v. Obama,*
  409 F. App'x 360 (D.C. Cir. 2011) .................................................................. 34

## STATUTES

10 U.S.C. § 7013 ............................................................................................. 28

10 U.S.C. § 7031 ............................................................................................. 28

10 U.S.C. § 7032 ............................................................................................. 28

* Authorization for Use of Military Force,
  Pub. L. No. 107-40, 115 Stat. 224 (2001) .................................................... 1, 9

Authorization for Use of Military Force Against Iraq Resolution of 2002,
  Pub. L. No. 107- 243, 116 Stat. 1498 ............................................................ 10

* Military Commissions Act of 2006,
  Pub. L. No. 109-366, 120 Stat. 2631 .......................................................... 3, 26

* National Defense Authorization Act for Fiscal Year 2012,
  Pub. L. No. 112-81, 125 Stat. 1298 (2012) ............................................ 1, 12, 27

National Defense Authorization Act for Fiscal Year 2016,
  Pub. L. No. 114-92, 129 Stat. 721 (Nov. 15, 2015) ......................................... 6

* National Defense Authorization Act for Fiscal Year 2022,
  Pub. L. No. 117-81, 135 Stat. 1541 (Dec. 27, 2021) .................................... 6, 12

Joint Resolution,
  Pub. L. No. 98-119, 97 Stat. 805 (1983) ........................................................ 11

Joint Resolution,
  Pub. L. No. 4, 69 Stat. 7 (1955) .......................................................................... 11

**EXECUTIVE ORDERS**

Executive Order 12,866,
  58 Fed. Reg. 51,735 (Sept. 30, 1993) .................................................................. 36

Executive Order 12,893,
  59 Fed. Reg. 4233 (Jan. 26, 1994) ....................................................................... 36

Executive Order 12,898,
  59 Fed. Reg. 7629 (Feb. 11, 1994) ....................................................................... 36

* Executive Order 13,492,
  74 Fed. Reg. 4897 (Jan. 22, 2009) ................................................................. *passim*

Executive Order 13,567,
  76 Fed. Reg. 13,277 (Mar. 7, 2011) ..................................................................... 37

**OTHER AUTHORITIES**

2 Lassa Oppenheim, International Law 613 (Hersch Lauterpacht ed., 7th ed. 1952) ................. 23

3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the
  Treatment of Prisoners of War (J. Pictet ed., 1960) ................................................. 24

107 Cong. Rec. H5641 ...................................................................................... 11

Action Memo for Designated Civilian Officer from Convening Authority, Combatant Status
  Review Tribunal (Jan. 25, 2005) ..................................................................... 32

* Army Regulation ("AR") 190-8 (Oct. 1, 1997),
  https://perma.cc/J45D-C4GT ..................................................................... *passim*

Congressional Research Service, Al Qaeda: Background, Current Status,
  and U.S. Policy ................................................................................... 20, 23

Congressional Research Service, Authorization for Use of Military Force in Response to
  the 9/11 Attacks (P.L. 107-40): Legislative History (Jan. 16, 2007),
  https://perma.cc/Y95W-6WZY .......................................................................... 10

* DoD Directive 2310.01E,
  https://perma.cc/N8ZL-T4AE ....................................................................... 28, 32

DoD Directive 5101.1,
  https://perma.cc/R3UL-JDPD ........................................................................... 28

DoD Law of War Manual § 4.27.2 ............................................................................ 32

DoD Law of War Manual § 8.14.3.1 (June 2015, Updated Dec. 2016) ....................................... 23

DoD Law of War Manual § 9.37.2 ............................................................................................. 23

DoD Law of War Manual § 9.73.2 ............................................................................................. 24

FDD's Long War Journal, *Ayman al Zawahiri promotes 'Jerusalem Will Not Be Judaized'
    campaign in new video* (Sept. 11, 2021),
    https://perma.cc/4S27-NZ4U ........................................................................................... 21

* Final Report—Guantanamo Rev. Task Force, Exec. Summary (Jan. 22, 2010),
    https://perma.cc/2QRK-9ZQ3 ...................................................................................... 6, 7, 37

G. Schwarzenberger, International Law 216 (5th ed. 1967) ...................................................... 23

ICRC Commentary of 2020, Convention (III) relative to the Treatment of Prisoners of
    War. Geneva, 12 August 1949 .......................................................................................... 23

Letter from the President, Letter to the Speaker of the House and President Pro Tempore of
    the Senate Regarding the War Powers Report (Dec. 8, 2022),
    https://perma.cc/55VF-2X9P ............................................................................................ 24

Letter to the Speaker of the House of Representatives and the President of the Senate
    on the Continuation of the National Emergency with Respect to Certain Terrorist
    Attacks (Sept. 9, 2022),
    https://perma.cc/DX5D-8GKM .................................................................................... 21, 22

Military Commission website,
    https://www.mc.mil/Cases.aspx?caseType=omc&status=1&id=55 ....................................... 19

Office of the Director of National Intelligence, Annual Threat Assessment (Feb. 7, 2022),
    https://perma.cc/ND9Q-DSRR ........................................................................................ 22

Presidential Memorandum, *Humane Treatment of al Qaeda and Taliban Detainees*
    (Feb. 7, 2002) ................................................................................................................... 30

Press Release, US Central Command (Dec. 11, 2022),
    https://perma.cc/K7PH-T328 ............................................................................................ 24

* Remarks by President Biden on Afghanistan at 5 (Aug. 16, 2021),
    https://perma.cc/U8YG-LNJX ..................................................................................... 9, 21, 22

* Remarks by President Biden on a Successful Counterterrorism Operation in Afghanistan,
    (Aug. 1, 2022),
    https://perma.cc/9WY3-5PRA ........................................................................................... 21

Report on the Legal and Policy Frameworks Guiding the United States' Use of Military
    Force and Related National Security Operations (Dec. 2016),
    https://perma.cc/Z5WV-TMMH ................................................................................ 20, 24, 25

The 9/11 Commission Report: Final Report of the National Commission on Terrorist
    Attacks upon the United States (2004). ........................................................................ 9, 10, 30

The Handbook of Humanitarian Law in Armed Conflicts § 732 (Dieter Fleck ed., 1995) .......... 24

Third Geneva Convention .................................................................................................... 29, 30

# INTRODUCTION

The Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 § 2(a) (2001), authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks [of September 11, 2001]" or who "harbored such organizations or persons." AUMF.  In *Hamdi v. Rumsfeld*, the Supreme Court held that "necessary and appropriate" use of force under the AUMF included the detention of combatants while hostilities were ongoing.  *See* 542 U.S. 507, 520 (2004) (Plurality).[1]  Congress ratified this understanding of the President's detention authority in 2011, "affirm[ing]" that the President's authority under the AUMF includes the power to detain individuals who were "part of or substantially supported al-Qaeda . . . or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces."  Nat'l Defense Auth. Act for Fiscal Year 2012 ("2012 NDAA"), Pub. L. No. 112-81, 125 Stat. 1298, 1564 (2012), § 1021(a) & (b)(2).  Further, in the 2012 NDAA Congress also affirmed that the authority conferred to the President by the AUMF includes "[d]etention under the law of war without trial until the end of the hostilities authorized by" the AUMF.  *Id.* § 1021(c)(1).  The law of this Circuit is the same.  *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014) ("[T]his court has repeatedly held that under the [AUMF] individuals may be detained at Guantanamo so long as they are determined to have been part of al-Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing."); *Ali v. Obama*,

---

[1] Justice Thomas wrote separately and provided a fifth vote for upholding law-of-war detention authority under the AUMF, but he would have gone further than the plurality, stating that "the power to detain does not end with cessation of formal hostilities." *See Hamdi*, 542 U.S. at 587-88 (Thomas, J., dissenting).

736 F.3d 542, 544 (D.C. Cir. 2013) ("Detention under the AUMF may last for the duration of hostilities.").

This Court has previously found that Petitioner Tofiq Nasser Awad Al-Bihani is lawfully detained by the United States at Guantanamo Bay under AUMF as "part of al-Qaida," *see Al-Bihani v. Obama*, 2010 LEXIS 107590 (D.D.C. Sept. 22, 2010), thereby justifying his continued law-of-war detention while hostilities against al-Qaida and associated forces remain ongoing. Nevertheless, in his supplemental petition for a writ of habeas corpus, *see* ECF No. 1, Petitioner cites the withdrawal of U.S. military personnel from Afghanistan and argues that he now is entitled to immediate release pursuant to Army Regulation 190-8's implementation of Article 118 of the Third Geneva Convention. Article 118 provides for the release of prisoners of war after "the cessation of active hostilities," and Section 3-13 of Army Regulation 190-8 includes a provision that "[p]risoners [of war] who are not sick or wounded will be repatriated or released at the cessation of hostilities as directed by" the Office of the Secretary of Defense. *See* Army Regulation ("AR") 190-8 (Oct. 1, 1997), https://perma.cc/J45D-C4GT (attached as Exhibit 3). Additionally, Petitioner argues that he is not detainable under the AUMF because he falls within a class of Yemeni detainees recommended for "conditional detention" based on security conditions in Yemen by the Guantanamo Review Task Force, established in 2009 pursuant to Executive Order 13,492. Each of these arguments fail, and the Court should deny his petition.

*First*, as this Court recognized in Petitioner's prior habeas petition proceeding, Petitioner has been lawfully detained as a part of al-Qaida. As confirmed by ample evidence, those hostilities against al-Qaida and associated forces, authorized by the AUMF, remain ongoing, justifying the legality of Petitioner's continued detention. Further, the withdrawal of U.S. combat forces from Afghanistan does not undermine the lawfulness of Petitioner's continued detention. Indeed,

several other courts in this District have rejected Petitioner's very argument in recent habeas proceedings. *See Paracha v. Biden*, 2022 WL 2952493, at *4 n.3 (D.D.C. Jul. 26, 2022) (Friedman, J.); *Husayn v. Austin*, 2022 WL 2093067, at *2–4 (D.D.C. Jun. 10, 2022) (Sullivan, J.); *Gul v. Biden*, 2021 WL 5206199, *2–4 (D.D.C. Nov. 9, 2021) (Mehta, J.).  In each of those cases, the court declined to order release based on the withdrawal of United States forces from Afghanistan, holding that, because hostilities authorized by the AUMF remain ongoing, detention remains authorized.  *See Paracha*, 2022 WL 2952493, at *6; *Husayn v. Austin*, 2022 WL 2093067, at *7; *Gul v. Biden*, 2021 WL 5206199, at *3.  Moreover, as discussed *infra* at 9-26, publicly-available and other evidence demonstrates that hostilities are ongoing.  Respondents are also submitting declarations from the Department of Defense—from the Vice Director of Operations for the Joint Chiefs of Staff at the Pentagon and from the Defense Intelligence Agency—addressing the status of ongoing hostilities against al-Qaida and associated forces.[2]

*Second*, setting aside that hostilities against al-Qaida and associated forces are ongoing, the 2006 Military Commissions Act 2006 ("2006 MCA"), Pub. L. No. 109-366, 120 Stat. 2631, precludes Petitioner from seeking relief under the Third Geneva Convention. *See Al-Bihani v. Obama*, 590 F.3d 866, 875 (D.C. Cir. 2010) (noting that that under the 2006 MCA a detainee may not "invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or . . .  agent of the United States is a party as a

---

[2] The parties have jointly moved for the entry of a protective order in this case. *See* ECF No. 8 (Nov. 14, 2022).  Following the court's resolution of that motion, and assuming the court enters the protective order, Respondents will file unredacted versions of these declarations, which are classified at the SECRET/NOFORN level and, accordingly, will be filed via the Classified Information Security Officer.  Public versions of the declarations are attached as Ex. 1 (Kacher Declaration) and Ex. 2 (DIA Declaration).  The declarations submitted are updated from, and provide information supplemental to, prior declarations submitted by Respondents in *Gul*, *Husayn*, and *Paracha*, and were recently filed in the habeas case of *Qassim v. Biden*, Case No. 04-cv-1194 (TFH), ECF Nos. 1211-1213.

source of rights in any court."). Nor can Petitioner enforce the Convention indirectly by relying, as Petitioner does, on Army Regulation 190-8, because, among other things, detention operations at Guantanamo Bay are exempt from AR-190 under an Exception Memorandum promulgated by the Secretary of the Army. *See* Memorandum from Ryan D. McCarthy, Sec'y of the Army, to Commander, U.S. Southern Command 2 (January 11, 2021) (attached as Exhibit 4) [hereinafter SecArmy Memo or Exception Memorandum]. Petitioner does not challenge or reference the Exception Memorandum in his Petition, and, in any event, any challenge would fail because the Memorandum is consistent with law. And because detention operations at Guantanamo Bay, for this reason and others, are exempt from the provisions of AR 190-8 that are the basis for Petitioner's argument, Petitioner cannot rely on the line of cases associated with *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ("*Accardi*") to argue purported administrative noncompliance on the part of Respondents with applicable regulations.

*Third*, separate from his argument for relief based on the alleged end of hostilities, Petitioner advances a second theory for release based on the fact that he was among a group of Yemeni detainees designated for "conditional detention" under the 2009 Guantanamo Review Task Force process. But contrary to Petitioner's suggestion, his designation for conditional detention does not call into question the lawfulness of his detention under the AUMF for the duration of hostilities, but rather is a discretionary threat-related assessment that Petitioner could be transferred if (1) the security situation improves in Yemen; (2) an appropriate rehabilitation program becomes available; or (3) an appropriate third-country resettlement option becomes available. *See infra* at 6-7. The Executive Order establishing the Task Force specifically states that it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies,

4

or entities, its officers, employees, or agents, or any other person," Exec. Order No. 13,492, § 8(c), 74 Fed. Reg. 4897, 4900 (Jan. 22, 2009), so Petitioner cannot rely on the Executive Order or his designation pursuant to the process undertaken pursuant to the Executive Order as a basis for habeas relief here. In any event, while the United States continues to explore avenues for the resettlement of detainees such as Petitioner who are eligible for transfer to willing third-countries, as explained by the Court of Appeals in *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010), "[w]hether a detainee would pose a threat to U.S. interests if released is not at issue in habeas corpus proceedings in federal courts concerning aliens detained under the authority conferred by the AUMF[;]" indeed, "the United States's authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released but rather upon the continuation of hostilities," *id.*

Respondents continue their efforts to find appropriate resettlement locations for Yemeni detainees such as Petitioner.  For the reasons discussed above and those that follow, however, the Court should deny Mr. Al-Bihani's petition.

## BACKGROUND

Mr. Al-Bihani previously petitioned this Court for a writ of habeas corpus, in which he challenged the lawfulness of his detention at the United States Naval Station at Guantanamo Bay. Following extensive briefing and a two-day evidentiary hearing, the Court denied the writ in a memorandum opinion, finding "that the government has provided more than enough evidence to satisfy its burden of establishing the lawfulness of the petitioner's detention under the AUMF" as "part of" al-Qaida. *See Al-Bihani v. Obama*, 05-cv-2386 (RBW), ECF No. 1773, Memorandum Opinion Denying Petition for Writ of Habeas Corpus (Sept. 22, 2010) at 17 (attached as Exhibit

5), *also available* at 2010 LEXIS 107590 (D.D.C. Sept. 22, 2010).[3]   Respondents refer the Court

to that prior opinion for its detailed fact-finding relating to Petitioner's activities and connections

to al-Qaida that support the legality of Petitioner's detention at Guantanamo Bay under the AUMF.

In 2009, President Obama issued Executive Order 13,492, which established the

Guantanamo Review Task Force.  *See* Exec. Order No. 13,492, 74 Fed. Reg. 4897 (Jan. 22, 2009).

The purpose of the Task Force was to evaluate, among other things, "whether [a Guantanamo Bay

detainee's] continued detention is in the national security and foreign policy interests of the United

States."  *Id*. § 2(d), 74 Fed. Reg. 4897-99.  As noted in the Final Report of the Task Force, the

Task Force's mandate was to "decide on the proper disposition—transfer, prosecution, or

continued detention— of all 240 detainees [then] subject to the review."  *See* Final Report—

Guantanamo Rev. Task Force, Exec. Summary (Jan. 22, 2010) ("Task Force Report"),

https://perma.cc/2QRK-9ZQ3 (attached as Exhibit 6).  Petitioner Al-Bihani was one of thirty

Yemeni detainees designated for "conditional" detention "based on the current security

environment in that country." *See id.*  These detainees were "not approved for repatriation to

Yemen at this time, but may be transferred to third countries, or repatriated to Yemen in the future

if the current moratorium on transfers to Yemen is lifted and other security conditions are met."[4]

*Id.*

Although the Task Force Report noted that these "30 Yemeni detainees . . . pose a lower

threat than the 48 detainees designated for continued detention under the AUMF," Ex. 6, Task

---

[3] This Court's ruling in Al-Bihani's first petition was upheld by the D.C. Circuit in a summary affirmance, *see Al-Bihani v. Obama*, 2011 U.S. App. LEXIS 2600 (D.C. Cir. Feb. 10, 2011), and the Supreme Court denied Al-Bihani's petition for writ of certiorari, *see Al-Bihani v. Obama*, 2012 U.S. LEXIS 4337 (June 11, 2012).
[4] The moratorium on detainee transfers from Guantanamo to Yemen remains in place.  *See* National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 1032, 135 Stat. 1541, 1901 (Dec. 27, 2021); National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 1033, 129 Stat. 721, 969 (Nov. 15, 2015).

Force Report at 25, the Task Force did not call into question the legality of the law-of-war detention of any of these detainees nor mandate their transfer on a particular timetable.  Indeed, the Report stated that the group of Yemeni detainees identified for continuing conditional detention "*may* be transferred" if "one of the following conditions is satisfied: (1) the security situation improves in Yemen; (2) an appropriate rehabilitation program becomes available; or (3) an appropriate third-country resettlement option becomes available." *Id.* at 26.   Moreover, even if one of these conditions were satisfied, "the 29 Yemeni detainees approved for transfer"—a separate category of detainees under the Task Force's rubric—"would receive priority for any transfer options over the 30 Yemeni detainees approved for conditional detention." *Id.*   The Report further emphasized that designations for transfer did "not equate to a judgment that the government lacked legal authority to hold the detainee," nor did it "reflect a decision that the detainee poses no threat or risk of recidivism." *Id.* at 17.   Rather, such a designation reflected a judgment that "any threat posed by the detainee can be sufficiently mitigated through feasible and appropriate security measures in the receiving countr[ies]." *Id.*   Further, the Executive Order establishing the Task Force review, by its own terms, "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Exec. Order No. 13492, Section 8(c).

In 2018 Petitioner filed in his previously resolved habeas case a motion for an order granting a habeas writ.  *See Al-Bihani v. Obama*, 05-cv-2386 (RBW), ECF No. 2062 (Jan. 11, 2018) (petitioner and 10 other Guantanamo detainees joined in filing the motion in their respective habeas cases).  Petitioner argued that his continued detention violated due process based on the duration of the detention and on the use of the preponderance standard as Respondents' burden of

proof in his prior habeas proceeding. *Id.* Petitioner also argued that his designation for "conditional detention" by the Task Force undermined the legitimacy of his continued detention. *Id.* That motion was referred to Judge Thomas F. Hogan for disposition, No. 05-cv-2386, Minute Order (Jan. 18, 2018), and remains pending.

In his current Petition, Petitioner alleges that in 2015 the Government solicited information from Petitioner's counsel regarding Petitioner's family connections to Saudi Arabia in view of possible transfer of Petitioner to that country. Pet. ¶¶ 84-87, 91. As Respondents explained in their response to Petitioner's 2018 due process motion, in January 2017 the Secretary of Defense determined that Petitioner should not be transferred at that time based on a variety of substantive concerns relevant to Petitioner's circumstances, including factors not related to Petitioner himself. *See* No. 05-cv-2386, ECF No. 2077, Resps' Opp. to Petitioner['s] Motion for Order Granting Writ of Habeas Corpus (Feb. 16, 2018) at 10. Petitioner, however, remains eligible for transfer, as described above, and Respondents are continuing their efforts to locate appropriate resettlement locations for him and other transfer-eligible Yemeni detainees.

In his current Petition, Petitioner nonetheless argues that "[b]ecause Petitioner was designated for conditional detention, he necessarily cannot be lawfully detained under the AUMF." Pet. ¶¶ 112-113. He also asserts that "[b]ecause active hostilities in Afghanistan have ceased, Respondents must immediately release [Petitioner] under U.S. Army Regulation 190-8." *Id.* ¶ 113. Petitioner argues that his continued detention thus violates due process and Respondents' "own procedures." *Id.* ¶ 115. As explained below, Petitioner's claims should be rejected.

**ARGUMENT**

I.   **PETITIONER'S   DETENTION   REMAINS   LAWFUL   BECAUSE   THE HOSTILITIES AUTHORIZED BY THE 2001 AUMF REMAIN ONGOING**

   A.   **The AUMF Authorizes the Use of Force Against al-Qaida and Associated Forces; Such Authorization is Not Geographically Limited to Afghanistan.**

Petitioner's argument that the withdrawal of U.S. military personnel from Afghanistan constitutes an end of hostilities necessitating Petitioner's release should be rejected.  As discussed *supra* at 1, the AUMF authorizes the President to "use all necessary and appropriate force"—not solely or specifically within Afghanistan—but, rather, "against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." AUMF, § 2(a), 115 Stat. at 224. As the preamble to the AUMF explains, its purpose is "[t]o authorize the use of United States Armed Forces against those responsible for the [then] recent attacks launched against the United States." *Id.*, preamble. The statute includes no reference to Afghanistan and no restriction on the statute's geographic reach.

In his August 16, 2021, remarks, the President observed that "we went to Afghanistan almost 20 years ago with clear goals: get those who attacked us on September 11th, 2001, and make sure al-Qaeda could not use Afghanistan as a base from which to attack us again." Remarks by President Biden on Afghanistan at 5 (Aug. 16, 2021), https://perma.cc/U8YG-LNJX. But although Afghanistan had served as a base or hub for al-Qaida, that organization's far-flung terrorist activities had hardly been confined to that country. The September 11, 2001 attacks, of course, occurred on U.S. soil, the plot having been hatched and preparations made in places as geographically scattered as Malaysia, Germany, the United Arab Emirates, and Pakistan, by nationals of a number of different countries. *See The 9/11 Commission Report: Final Report of the*

*National Commission on Terrorist Attacks upon the United States* 156-68, 236-37 (2004) ("9/11 *Report*").

Even before September 11, 2001, al-Qaida had carried out a series of terrorist attacks against the United States in locations as far from Afghanistan as Kenya, Tanzania, and the port of Aden in Yemen. *See 9/11 Report* at 115-16 (U.S. embassy attacks), 190-91 (U.S.S. Cole attack). Responding to this terrorist group that did not respect national borders, Congress wrote no geographic limitation into the AUMF. A report addressing the legislative history of the AUMF observed: "A notable feature of [the AUMF] is that unlike all other major legislation authorizing the use of military force by the President, this joint resolution authorizes military force against 'organizations and persons' linked to the September 11, 2001 attacks on the United States. In its past authorizations for use of U.S. military force, Congress has permitted action against unnamed nations in specific regions of the world, or against named individual nations, but never against 'organizations or persons.'" Congressional Research Service, Authorization for Use of Military Force in Response to the 9/11 Attacks (P.L. 107-40): Legislative History at 3 (Jan. 16, 2007) (attached as Exhibit 7), https://perma.cc/Y95W-6WZY.

In contrast to the 2001 AUMF, the following year Congress enacted an authorization for use of military force expressly focused on the threat emanating from Iraq. *See* Pub. L. No. 107-243, 116 Stat. 1498, 1500. The 2002 Iraq AUMF provides that the "President is authorized to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat *posed by Iraq*." *Id.*, § 3(a)(1), 116 Stat. at 1500 (emphasis added). Such a reference to, or nexus with, a particular region or country has appeared in more than a dozen other congressional authorizations for use of military force.  For example, in 1983, Congress authorized the President "to continue participation

by United States Armed Forces in the Multinational Force in Lebanon." Multinational Force in Lebanon, Pub. Law No. 98-119, § 3, 97 Stat. 805 (1983). Likewise, in 1955, Congress authorized the President specifically "to employ the Armed Forces of the United States for protecting the security of Formosa, the Pescadores and related positions and territories of that area." Joint Resolution, Pub. L. No. 4, 69 Stat. 7 (1955). These and numerous other authorizations for the use of force referring to particular locales show that when Congress intends to include a geographic aspect or reference in such an authorization, Congress does so unambiguously. It did not do so in the 2001 AUMF.

In considering passage of the 2001 AUMF, contemporaneous remarks confirm that Congress intended to grant authority in the 2001 AUMF to use force not with respect to a particular country or region, but with respect to those organizations responsible for the terrorist attacks that the United States had just suffered. *See*, *e.g.*, 107 Cong. Rec. H5641 ("I rise tonight to fully endorse and authorize the use of force as directed by the President of this great Nation . . . Mr. President, *no matter where we have to go*, no matter how long we have to fight, we are prepared to fulfill our duty to generations to come.") (Rep. Norwood) (emphasis added); *id.* at H5643 ("I join my colleagues in support of this resolution authorizing the use of military force . . . [o]ur enemies, whoever and *wherever they are*, and those who harbor them, must clearly understand that we will never tolerate the acts of terrorism, acts of war, that have been perpetrated upon us and they must understand that there is no escape from American justice.") (Rep. Napolitano) (emphasis added); *id.* at H5644 ("The current circumstances leave us with great uncertainty. We do not yet know who committed these unspeakable acts *or where we may find them*, we do not know the scale and scope of what bringing the perpetrators to justice may mean, and we do not know how long it may take.") (Rep. Skelton) (emphasis added).

The 2012 NDAA provides further evidence that Congress did not intend for the detention authority conferred by the AUMF to be predicated on the existence of U.S. military operations in a particular location. In the 2012 NDAA, Congress affirmed that the AUMF authorizes the detention of "[a] person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners," *id.* § 1021(b)(2), 125 Stat. at 1562, again without any territorial or geographic limitation. Congress thus affirmed the scope of the 2001 AUMF and did not provide a geographic restriction. The National Defense Authorization Act for Fiscal Year 2022 ("2022 NDAA"), Pub. L. No. 117-81, 135 Stat. 1541, signed into law by the President on December 27, 2021, provides still more evidence that Congress did not intend to condition detention authority on the existence of military operations in a particular location. The 2022 NDAA—enacted months after the completion of the withdrawal of U.S. forces from Afghanistan—refers to ongoing detention operations at Guantanamo Bay, for example requiring within 120 days a report to members of Congress regarding "the provision of medical care to individuals detained at Guantanamo," *id.* § 1036(a), and includes no measure to discontinue detention operations at Guantanamo Bay in light of the withdrawal from Afghanistan.

Petitioner may attempt to argue that the Supreme Court in *Hamdi* limited the geographic scope of the 2001 AUMF to Afghanistan. Any such assertion, however, would be misplaced. In *Hamdi* the Supreme Court addressed a habeas petition by a detainee who had taken up arms with the Taliban in Afghanistan. *See Hamdi*, 542 U.S. at 510. Focusing on the facts presented in that case, the Plurality observed that "active combat operations against Taliban fighters apparently are ongoing in Afghanistan," and held that the petitioner's detention remained lawful while that was the case. *Id*. at 521. The Court, however, did not purport to limit detention authority under the

2001 AUMF in the case of the broader conflict against al-Qaida and associated forces.  The Court

stated that the AUMF "include[s] the authority to detain for the duration of the relevant conflict,"

*id*.; in this case, that "relevant" conflict is the conflict against al-Qaida and associated forces.

Indeed, the question of any limit on the geographic scope of the AUMF was not presented

in *Hamdi*.  Rather, as the Court in *Husayn* explained when rejecting the same argument, the

Plurality's statement that the detention at issue in that case was authorized because "United States

troops are still involved in active combat in Afghanistan" simply reflected the "factual

underpinning inform[ing] the Supreme Court's conclusion that [Hamdi's] detention was

authorized by the AUMF."  *Husayn*, 2022 WL 2093067, *3 (quoting Hamdi, 542 U.S. at 521).  It

would be anomalous indeed if the Supreme Court had, without so much as a remark regarding the

extraordinary step, introduced a geographic limitation into an authorization for use of military

force where Congress had supplied none.

**B.     Whether an Armed Conflict has Ended is a Question On Which Courts
         Defer to the Political Branches**

Aside from Petitioner's erroneous contention that the 2001 AUMF limits the permissible

geographic scope of military force against al-Qaida and associated forces to Afghanistan, it is well-

established in this Circuit that "the 'termination' of hostilities is 'a political act.'" *Al-Alwi v. Trump*,

901 F.3d 294 (D.C. Cir. 2018) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 168-69 (1948)); *see*

*also The Prize Cases*, 67 U.S. (2 Black) 635, 666 (1862) (whether a state of war existed such that

President Lincoln could invoke the laws of war and impose a blockade on the southern states

during the Civil War "is a question to be decided *by him*, and this Court must be governed by the

decision and acts of the political department") (emphasis in original). The D.C. Circuit recently

reaffirmed that the determination of when hostilities have ceased is a political decision. *See Al-*

*Alwi*, 901 F.3d at 299; *see also Maqaleh v. Hagel*, 738 F.3d 312, 341 (D.C. Cir. 2013) ("whether

an armed conflict has ended is a question left exclusively to the political branches"). "If the 'life of a statute' conferring war powers on the Executive 'is defined by the existence of a war, Congress leaves the determination of when a war is concluded to the usual political agencies of the Government.'" *Al-Alwi*, 901 F.3d at 299; *see also Al-Bihani*, 590 F.3d at 874 (emphasizing that, under separation of powers principles, the judiciary is obligated to give the political branches 'wide deference' on questions concerning the cessation of hostilities).

In so holding, the Court of Appeals relied principally on *Ludecke v. Watkins*, which held that the President retained the war power to deport enemy aliens notwithstanding the surrender of Germany in World War II, because the political branches had not terminated hostilities. *See Al-Alwi*, 901 F.3d at 300 (describing and quoting *Ludecke*, 335 U.S. at 168-70). Noting that the law does not "lag behind common sense," the Supreme Court recognized that war does not necessarily end with a cease-fire order; rather, war "may be terminated by treaty or legislation or Presidential proclamation. Whatever the mode, its termination is a political act." *Ludecke*, 335 U.S. at 168- 69. Questions concerning the time at which wars end thus are "matters of political judgment for which judges have neither the technical competence nor official responsibility." *Id.* at 170.

*Ludecke*, in turn, followed a long line of Supreme Court cases addressing other armed conflicts. *See*, *e.g.*, *United States v. Anderson*, 76 U.S. 56, 70-71 (1869) (relying on a public proclamation from President Andrew Johnson to establish the end date for the Civil War, explaining the "inherent difficulty of determining" when the Civil War ended, and rejecting an argument that a court could determine the end point of the Civil War by identifying "when the last Confederate general surrendered to the National authority"); *The Protector*, 79 U.S. 700, 701-702 (1871) ("Acts of hostility by the insurgents occurred at periods so various, and of such different degrees of importance, and in parts of the country so remote from each other, both at the

commencement and the close of the late civil war, that it would be difficult, if not impossible, to say on what precise date it began or terminated. It is necessary, therefore, to refer to some public act of the political departments of the government to fix the dates"); *The Three Friends*, 166 U.S. 1, 63 (1897) ("But it belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted to the terms of the intention expressed."); *Commercial Trust Co. of New Jersey v. Miller*, 262 U.S. 51, 57 (1923) (stating that a "court cannot estimate the effects of a great war and pronounce their termination at a particular moment of time"); *see also Citizens Protective League v. Clark*, 155 F.2d 290, 295 (D.C. Cir. 1946) ("It is not for the courts to determine the end of a war declared by the Congress.").

In *Al-Alwi*, the Court of Appeals applied this approach with respect to the current armed conflict.  *See Al-Alwi*, 901 F.3d at 299. There the petitioner claimed that the United States' detention authority under the AUMF had expired because the conflict in which he was captured and detained had ended. *See id.* at 299-300. The Court of Appeals looked first to the Executive Branch's determination that active hostilities continued, and then observed that the record confirmed the Executive Branch's representations. *See id.* at 299 (citing evidence of ongoing fighting, and that "there have been numerous specific instances of hostile forces, including the Taliban and al-Qaeda, attacking or planning to attack U.S. personnel and facilities in Afghanistan").  The Court of Appeals concluded: "[T]he Executive Branch represents, with ample support from record evidence, that the hostilities described in the AUMF continue. In the absence of a contrary Congressional command, that controls." *Id.* (citing and quoting *Ludecke*, 335 U.S. at 168-70).

The D.C. Circuit has also held that courts have neither the authority nor the expertise to evaluate the operational capacity and future threat posed by an enemy of the United States,

especially when that enemy is a transnational terrorist organization such as al-Qaida. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) ("whether the terrorist activities of foreign organizations constitute threats to the United States are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry") (citations omitted). This reality underscores the need for judicial deference to the determination of the political branches with respect to the point at which hostilities end. *See Center for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003) (acknowledging the "long-recognized deference to the executive on national security issues" and applying that deference in the context of the current armed conflict where "America faces an enemy just as real as its former Cold War foes, with capabilities beyond the capacity of the judiciary to explore.")

Any holding to the contrary by the Court would raise serious separation of powers concerns on a question of national security that "uniquely demand[s] [a] single-voiced statement of the Government's views." *See Baker v. Carr*, 369 U.S. 186, 211 (1962); *see also Hamdi v. Rumsfeld*, 337 F.3d 335, 341 n.1 (4th Cir. 2003) (Wilkinson, J., concurring in the denial of rehearing *en banc*) ("It would be an intrusive venture into international relations for an inferior federal court to declare a cessation of hostilities and order a combatant's release when an American military presence remained in the theater of combat, and when the status of combatants, their terms of release, and the mutuality of exchanges may all remain subjects for negotiation and diplomacy.").

Precisely because questions surrounding the end point of active hostilities rest on military judgments regarding factors that critically affect the national defense, the Supreme Court has consistently held for more than 100 years that these decisions are properly left to the political branches. *See Anderson*, 76 U.S. at 70-71. All three judges of this Court who have considered the

argument that detention authority has lapsed based on the withdrawal of United States forces from Afghanistan have cited those cases and acknowledged the need for deference in this setting. Indeed, as Judge Mehta recognized in adjudicating a request for release similar to Petitioner's, "[w]hether active hostilities persist is perhaps one of the weightiest questions a court can take up, and, for that reason, the court must afford the utmost deference to the Executive's position on that question."  *Gul*, 2021 WL 5206199, at *2.  "When 'the Executive Branch represents, with ample support from record evidence, that the hostilities described in the AUMF continue,' and when Congress has not given a 'contrary command,' the Executive Branch's representation 'controls.'"  *Id.* (quoting *Al-Alwi v. Trump*, 901 F.3d 294, 300 (D.C. Cir. 2011)).  *See also Paracha*, 2022 WL 2952493, at *5 (same); *Husayn*, 2022 WL 2093067, at *2 (same).   There is no basis for this Court to depart from Circuit precedent or the rulings of other Judges of this Court on the issue.

### C.   Respondents' Ongoing Actions Against Al-Qaida and Associated Forces Reflect the Scope of the Authority Conferred by the AUMF

Petitioner's end-of-hostilities argument, as previously noted, is centered on the withdrawal of U.S. forces from Afghanistan.  But consistent with the text of the AUMF and the manifest intention of Congress in passing it, U.S. forces have long employed the authority granted therein to pursue and engage al-Qaida and associated forces not only in Afghanistan but in other countries as well.  Indeed, the use of AUMF authority beyond Afghanistan is a longstanding consequence of the reality that al-Qaida and associated forces are non-state armed groups that do not respect national boundaries.

#### 1.   Throughout the Conflict, Hostilities Against Al Qaida and Associated Forces Have Extended Far Beyond Afghanistan.

Contrary to Petitioner's apparent contention that hostilities under the 2001 AUMF are geographically constrained to Afghanistan and the withdrawal of U.S. combat military personnel

from that country constitutes an end of AUMF-authorized hostilities, from the outset of the hostilities authorized by the AUMF, the armed conflict against al-Qaida and associated forces has not been limited to Afghanistan.

To begin with, Petitioner's effort to define the relevant conflict as geographically restricted to Afghanistan finds no support in the factual assertions supporting Petitioner's own detention in this case. Rather, as this Court found in its decision on Petitioner's habeas petition, the activities of Petitioner and other al-Qaida operatives reflect efforts by al-Qaida and associated forces ranging beyond Afghanistan's borders to Pakistan and other countries. For example, Petitioner originally traveled to Afghanistan "motivated by his desire to prepare for jihad in Chechnya," where his brother "had close relationships with senior Chechen fighters and other individuals who were engaged in training men to fight in Chechnya and in other countries." *Al-Bihani*, 2010 U.S. Dist. LEXIS 107590 at * 19-20; *see also id.* at * 43-44 (finding that Petitioner's "intent all along after leaving" an al-Qaida training camp in Afghanistan "was to accompany [his brother] to Chechnya . . . for further military training.") And prior to his apprehension and transfer to Guantanamo Bay, petitioner spent time in Pakistan and Iran. *Id.* at * 25-26.

Similarly, the factual underpinnings of major cases in this area make clear that the Executive Branch's authority under the 2001 AUMF extends beyond Afghanistan. Most notably, in *Boumediene v. Bush*, although some of the petitioners in that case were captured in Afghanistan, others were apprehended "in places as far away from there as Bosnia and Gambia." *Boumediene v. Bush,* 553 U.S. 723, 734 (2008).[5] Throughout the Guantanamo Bay habeas litigation, courts

---

[5] As early as 2004, the Government's submissions to the courts referred to "the military campaign in Afghanistan and the war against al Qaeda more generally." Resp. to Petitions for Writ of Habeas Corpus and Mot. To Dismiss or for Judgment as a Matter of Law and Mem. in Support, Civ. No. 04-1142, ECF No. 25 (D.D.C. Oct. 4, 2004) at 15. Subsequently, in a 2009 submission addressing the Government's detention authority, the Government explained that imposing a geographic limit
*(footnote continued on next page)*

have properly focused not on the location where a detainee's activities took place, but rather on whether a detainee was part of or substantially supported al-Qaida, Taliban, and associated forces. *See. e.g.*, *Ali v. Obama*, 736 F.3d 542, 547 (D.C. Cir. 2013) (relying on activities in Pakistan).

Likewise, in *Al Hela v. Trump*, the D.C. Circuit affirmed that detention was lawful based on a Yemeni citizen's activities—largely in Yemen—substantially supporting al-Qaida and two groups found to be associated forces of al-Qaida: Egyptian Islamic Jihad ("EIJ") and the Aden-Abyan Islamic Army ("AAIA").  *See Al Hela v. Trump*, 972 F.3d 120 (D.C. Cir. 2020), *judgment vacated for rehearing en banc on other grounds*. In affirming the district court's determination that the groups were associated forces of al-Qaida, the D.C. Circuit focused on both groups' activities throughout the Middle East—outside of Afghanistan—and noted the "global and diffuse nature of the conflict." *Id.* at 133-34, 135.[6]

---

on the authority conferred by the AUMF "would contradict Congress's clear intention and would unduly hinder both the President's ability to protect our country from future acts of terrorism and his ability to gather vital intelligence regarding the capability, operations, and intentions of this elusive and cunning adversary." Resps.' Mem. Regarding the Gov't's Detention Authority Relative to the Detainees Held at Guantanamo Bay, *In re Guantanamo Bay Detainee Litigation*, No. 08-442, ECF No. 1690 (D.D.C. Mar. 13, 2009) at 7 (internal quotation omitted).

[6] Similarly, Guantanamo Bay detainees Encep Nurjaman (ISN 10019), Mohammed Nazir Bin Lep (ISN 10022), and Mohammed Farik Bin Amin (ISN 10021) are subject to detention based on activities inside and outside of Afghanistan, and in 2021were jointly referred for trial by a military commission for multiple violations of the law of war in connection with their alleged roles in the bombing of nightclubs in Bali, Indonesia, in 2002, and the bombing of a J.W. Marriott hotel in Jakarta, Indonesia, in 2003. As explained on the Military Commission website posting the charge sheets: "The charges include conspiracy, murder, attempted murder, intentionally causing serious bodily injury, terrorism, attacking civilians, attacking civilian objects, destruction of property, and accessory       after       the       fact,       *all     in     violation     of     the     law     of     war*." https://www.mc.mil/Cases.aspx?caseType=omc&status=1&id=55 (emphasis added); *see also* Charge Sheet (Encep Nurjaman), https://perma.cc/B8M7-UNM7; Charge Sheet (Mohammed Nazir Bin Lep), https://perma.cc/JN6K-KJQL; Charge Sheet (Mohammed Farik Bin Amin), https://perma.cc/85UD-TPQK. Although all three accused allegedly trained as part of al-Qaida in Afghanistan, where some overt acts allegedly took place, the nexus with that country is not central to the charges that they acted in violation of the law of war; rather, their activities in Southeast Asia are at the heart of the allegations against them.

A 2016 White House report addressing the legal and policy frameworks guiding the United States' use of military force and related national security operations likewise confirms the Government's position that the use of force authorized under the AUMF is not limited to Afghanistan. That report noted: "All three branches of the U.S. Government have affirmed the ongoing authority conferred by the 2001 AUMF and its application to al-Qa'ida, to the Taliban, and to forces associated with those two organizations within *and outside* Afghanistan." Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations at 4 (Dec. 2016), https://perma.cc/Z5WV-TMMH ("2016 White House Report") (emphasis added). The 2016 White House Report further explained: "[a]lthough Afghanistan was the focus when the 2001 AUMF was enacted in September 2001, the President's authority to use force pursuant to that statute is not limited to Afghanistan. The 2001 AUMF itself contains no such geographic limitation, and neither Congress nor U.S. Federal courts have limited the President's ability to use force in that way." *Id.* at 49 n.13. The same report noted that the 2001 AUMF authorized then-ongoing military operations in Afghanistan, Iraq, Syria, Somalia, Libya, and Yemen. *See id.* at 15-18. Afghanistan was just one of six "key theaters" identified in that report. *Id.* at 15.[7]

### 2. Hostilities Against Al-Qaida and Associated Forces Remain Ongoing.

Here, even the public record establishes that the fight continues: just within the last few months, the United States Government continues to assess that al-Qaida and its associated forces seek to attack the United States, as indicated by a United States drone strike in Kabul, Afghanistan,

---

[7] The United States has conducted airstrikes on al-Qaida targets in at least seven countries since 2012, and U.S. forces have engaged in ground combat against al-Qaida in Afghanistan, Somalia, and Yemen in recent years. *See* Congressional Research Service, Al Qaeda: Background, Current Status, and U.S. Policy at 2 (updated May 6, 2022) (attached as Exhibit 8). *See generally* Kacher Decl. (Ex. 1) and DIA Decl. (Ex. 2).

which killed the then-leader of al-Qaida.  See Remarks by President Biden on a Successful Counterterrorism Operation in Afghanistan,  (Aug. 1, 2022), https://perma.cc/9WY3-5PRA (attached as Exhibit 9).  *See also* Remarks by President Biden on Afghanistan (Aug. 16, 2021), https://perma.cc/H32Y-2DXS (noting that "the terrorist threat has metastasized well beyond Afghanistan" and "[t]hese threats warrant our attention and our resources").  Indeed, hostilities between the United States and al-Qaida and associated forces are ongoing.  As noted above, Respondents will be submitting declarations updating the Court regarding these ongoing hostilities.  But public evidence also demonstrates that the hostilities against al-Qaida did not end with the withdrawal of U.S. forces from Afghanistan.

For example, for its part, al-Qaida considers its war against the United States as ongoing. On the anniversary in 2021 of the September 11 attacks, al-Qaida reportedly released a propaganda video featuring its then-leader, Ayman al-Zawahiri, praising "martyrs" from al-Qaida and associated forces who had been killed in the ongoing hostilities against the United States in locations including Yemen, Egypt, and Syria.  *See* FDD's Long War Journal, *Ayman al Zawahiri promotes 'Jerusalem Will Not Be Judaized' campaign in new video* (Sept. 11, 2021), https://perma.cc/4S27-NZ4U.  Zawahiri exhorted his followers that their enemies, *i.e.* the United States and its allies, "can be bled to death . . . waging a war in which the entire world is the battlefield." *Id.*; *see also id.* ("We are a united Ummah [community], waging one war on different fronts").

The President and other senior government officials also have made clear that the conflict against al-Qaida and associated forces remains ongoing. On September 9, 2022, more than a year following the withdrawal of combat forces, the President reaffirmed that "[t]he terrorist threat that led to the declaration on September 14, 2001, of a national emergency continues." Letter to the

Speaker of the House of Representatives and the President of the Senate on the Continuation of the National Emergency with Respect to Certain Terrorist Attacks (Sept. 9, 2022), https://perma.cc/DX5D-8GKM. As the President previously explained in connection with the withdrawal of U.S. military personnel from Afghanistan, "[t]oday, the terrorist threat has metastasized well beyond Afghanistan: al Shabaab in Somalia, al Qaeda in the Arabian Peninsula, al-Nusra in Syria, ISIS attempting to create a caliphate in Syria and Iraq, and establishing affiliates in multiple countries in Africa and Asia." Remarks by President Biden on Afghanistan at 5 (Aug. 16, 2021), https://perma.cc/H32Y-2DXS.[8]

Although counter-terrorism efforts have removed several of al-Qaida's senior leaders from the battlespace, the remaining core leadership continues to aspire to conduct attacks in the United States, as well as assert direction for, seek the loyalty of, and encourage cooperation and growth among regional al-Qaida affiliates, which continue to pursue recruitment and plotting, especially in unstable or vulnerable areas, and threaten local U.S. personnel, interests, and partners. *See* Office of the Director of National Intelligence, Annual Threat Assessment at 5, 25-26 (Feb. 7, 2022), https://perma.cc/ND9Q-DSRR; *see also* Congressional Research Service, Al Qaeda:

---

[8] Petitioner cites to statements made by the President in April and July 2021 in which declared an end to "America's longest war" and indicated that the on-the-ground combat mission in Afghanistan would conclude "on August 31 [2021]." *See* Pet. ¶¶ 102-103. However, Supreme Court precedent forecloses the judicial termination of congressionally authorized war powers via colloquial references in a Presidential speech. *See Hamilton v. Ky. Distilleries & Warehouse Co.*, 251 U.S. 146 (1919). There, the Supreme Court emphasized that congressionally authorized war powers cannot be terminated by "passing references in messages to Congress, nor by newspaper interviews with high officers of the army or with officials of the War Department." 251 U.S. at 167. Indeed, if the President concluded that active hostilities against al-Qaida were over, he would doubtless have issued a clear statement to that effect. He has not. The *Hamilton* Court rejected an argument similar to the one Petitioner advances here. Relying on "statements of the President to the effect that the war has ended and peace has come," the plaintiff argued that President Woodrow Wilson's public statement announcing the end of World War I terminated certain congressionally-authorized wartime powers. *Id.* at 159. The Supreme Court disagreed, concluding that the President's announcement that the war was over was "doubtless used in a popular sense" and did not terminate restrictions on the sale of certain types of alcoholic beverages imposed by the War-Time Prohibition Act where the wartime actions of the Executive continued. *Id.* at 167-68.

Background, Current Status, and U.S. Policy at 2 (May 6, 2022), Ex. 8.  *See generally* Kacher

Decl. (Ex. 1) and DIA Decl. (Ex. 2).

Importantly, in explaining the Third Geneva Convention's obligation to release prisoners

of war at the end of an international armed conflict, the Department of Defense Law of War Manual

provides "[cessation of active hostilities] is the complete end of the fighting with clearly no

probability of resumption of hostilities in the near future." DoD Law of War Manual § 9.37.2; *see*

*also Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010) ("The Conventions, in short, codify

what common sense tells us must be true: release is only required when the fighting stops.").  The

International Committee of the Red Cross, in its recent commentary on the Third Geneva

Convention, likewise refers to "a lasting cessation of armed confrontations without real risk of

resumption." See ICRC Commentary of 2020, Convention (III) relative to the Treatment of

Prisoners of War. Geneva, 12 August 1949, 525. And other commentators agree. For example,

Professor Georg Schwarzenberger described "cessation of active hostilities" as "when, in good

faith, neither side expects a resumption of hostilities."  G. Schwarzenberger, International Law

216 (5th ed. 1967); *see also* 2 Lassa Oppenheim, International Law 613 (Hersch Lauterpacht ed.,

7th ed. 1952) ("Probably the phrase 'cessation of active hostilities' in the sense of Article 118

refers not to suspension of hostilities in pursuance of an ordinary armistice which leaves open the

possibility of a resumption of the struggle, but to a cessation of hostilities as the result of total

surrender or of such circumstances or conditions of an armistice as render it out of the question for

the defeated party to resume hostilities.").[9]

---

[9] The Department of Defense's interpretation of the law of war applicable to non-international
armed conflict is consistent with those authorities.  *See* DoD Law of War Manual § 8.14.3.1 (June
2015, Updated Dec. 2016) ("For persons who have participated in hostilities or belong to armed
groups that are engaged in hostilities, the circumstance that justifies their continued detention is
the continuation of hostilities. Thus, release of such persons is generally only required after the

(*footnote continued on next page*)

The current state of affairs does not reflect such a cessation of hostilities.  To the contrary, the United States continues to conduct operations against al-Qaida and associated forces where those forces are present.   U.S. Armed Forces remain in active hostilities with al-Qaida and associated forces in a number of different theaters and countries, including in Central Asia, Africa, and the Indo-Pacific.   A few examples:   U.S. military personnel remain postured outside Afghanistan to address threats to the U.S. interests that may arise from inside Afghanistan.  *See* Letter from the President, Letter to the Speaker of the House and President Pro Tempore of the Senate Regarding the War Powers Report (Dec. 8, 2022) ("WPR Report"), https://perma.cc/55VF-2X9P.  In East Africa, U.S. forces continue to counter the threat posed by ISIS and al-Shabaab, an associated force of al-Qaida; in recent months, U.S. forces conducted an air strike against a high-value al-Shabaab target and remain prepared to conduct air strikes against ISIS and al-Shabaab. *Id.*  Also, a small number of U.S. military personnel continue to be deployed to Yemen to conduct operations against al-Qaida in the Arabian Peninsula and ISIS.   *Id*.   Further, as recently as December 11, 2022, U.S. forces in Syria conducted a raid that successfully targeted two senior ISIS officials.[10]      *See*   Press   Release,   US   Central   Command   (Dec.   11,   2022),

---

conflict has ceased."); *cf. id.* at § 9.73.2 ("[Cessation of active hostilities in the Third Geneva Convention] is the complete end of the fighting with clearly no probability of resumption of hostilities in the near future."). Other international law commentators interpret Article 118 similarly.  *See*, *e.g.*, 3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, art. 118 at 547 (J. Pictet ed., 1960) (the rationale for detention—to prevent the detainee from taking up arms against the captor State again—no longer exists "once the fighting is over"); The Handbook of Humanitarian Law in Armed Conflicts § 732 (Dieter Fleck ed., 1995) (explaining that "cessation of active hostilities" involves a situation where "the fighting has stopped" as reflected by "lasting peace" and "demobilization of the parties to the conflict" as opposed to "merely an interruption in the hostilities").

[10] The AUMF has authorized the use of force against ISIS since at least 2004. See 2016 White House Report at 5. In 2004, Abu Mu'sab al-Zarqawi, the founder of al-Qaida in Iraq (AQI) —the group that became ISIS—in response to an invitation from bin Laden to merge with al-Qaida publicly pledged his group's allegiance to bin Laden, and bin Laden publicly endorsed al-Zarqawi

*(footnote continued on next page)*

https://perma.cc/K7PH-T328. Other examples of recent military and counterterrorism operations against al-Qaida and associated forces are spelled out further in the Declarations of Rear Admiral Fred Kacher and from an official with the Defense Intelligence Agency ("DIA"), submitted herewith. For example, on August 1, 2022, the President announced that the United States had conducted a successful strike in Kabul, Afghanistan, on al-Qaida leader Ayman al-Zawahiri. Ex. 1, Kacher Decl. ¶ 30. Since September 2, 2021, ISIS has claimed responsibility for more than 700 attacks in Iraq and more than 280 attacks in Syria, mostly against forces partnered with the United States. *Id.* ¶ 38. Additionally, al-Qaeda in the Islamic Maghreb ("AQIM") will likely continue to seek opportunities to threaten US and western interests in North and West Africa. Ex. 2, DIA Decl. ¶ 5. Closer to home, al-Qaida claimed responsibility for the 2019 shooting at the Naval Air Station in Pensacola, Florida. *Id.* ¶ 7. The evidence thus demonstrates that hostilities against al-Qaida and associated forces have not ceased.

* * *

Recent events confirm what common sense teaches: that the war against al-Qaida continues. Operations against al-Qaida and associated forces continue in Afghanistan, Somalia,

---

as al-Qaida's leader in Iraq. *See id.* For years afterwards, al-Zarqawi's group conducted deadly terrorist attacks against U.S. and Coalition forces. *See id.* The group has continued to plot attacks against U.S. persons and interests in Iraq and the region—including the brutal murder of kidnapped American citizens in Syria and threats to U.S. military personnel that are now present in Iraq at the invitation of the Iraqi Government. *See id.* at 6. The subsequent 2014 split between ISIS and current al-Qaida leadership does not remove ISIS from coverage under the AUMF. *See id.* Although ISIS broke its affiliation with al-Qaida, the same organization continues to wage hostilities against the United States as it has since 2004, when it joined bin Laden's al-Qaida organization in its conflict against the United States, and ISIS now claims that it—not al-Qaida's current leadership—is the true executor of bin Laden's legacy. *See id.* Nothing in the AUMF requires perpetual amity between organizations subject to its authorization of force, and a contrary interpretation of the statute would allow an enemy force to manipulate the scope of the AUMF by splintering into rival factions while continuing to prosecute the same conflict against the United States. *See id.*

Yemen, and Syria, among others.  Put simply, the withdrawal of combat forces from Afghanistan does not equate to an end to hostilities against al-Qaida and associated forces; to the contrary, such hostilities continue inside and outside of Afghanistan.  Having been found lawfully detainable under the 2001 AUMF by this court, *see Al-Bihani*, 2010 U.S. Dist. LEXIS 107590, Petitioner is not entitled to habeas relief based on the withdrawal of combat forces from Afghanistan.

## II.   THE 2006 MILITARY COMMISSIONS ACT FORECLOSES PETITIONER FROM INVOKING THE THIRD GEVENA CONVENTION, AND HE CANNOT INVOKE IT INDIRECTLY THROUGH ARMY REGULATION 190-8

Petitioner's argument for release based on the alleged end of hostilities fails on its own terms for the reasons just stated—because hostilities have not ended—so this Court need go no further.  Nevertheless, Respondents now address why Petitioner is wrong to demand immediate "release[]" based on Article 118 of the Third Geneva Convention of 1949 and Army Regulation 190-8. *See* Pet. ¶¶ 11, 15, 118.  Any attempt by Petitioner to rely *directly* on Article 118 of the Third Geneva Convention must fail, because it cannot be reconciled with § 5 of the Military Commissions Act of 2006 ("2006 MCA"), Pub. L. No. 109-366, 120 Stat. 2631. That clear statute means that a habeas petitioner such as Petitioner may not "invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or . . . agent of the United States is a party as a source of rights in any court." *Al-Bihani*, 590 F.3d at 875; *see id.* at 876 (noting 2009 revisions to MCA did not alter that 2006 MCA provision).

The proper framework here, instead (and as described above), is found in the 2001 AUMF, as informed by the law of war and affirmed by Section 1021 of the 2012 NDAA. Congress has "affirm[ed]" that the authority granted by the AUMF includes the authority to detain, "under the law of war," any "person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners."

*See* Pub. L. No. 112-81, 125 Stat. 1562 (2012), § 1021(b)(2).  Further, such detention is authorized "*until the end of the hostilities authorized by the* [AUMF]") (emphasis added); *see id.* § 1024(b), 125 Stat. 1565 (10 U.S.C. 801 note) (referring to "detention under the law of war pursuant to the [AUMF]").  Petitioner's claim therefore must be analyzed by examining domestic statutes, namely the AUMF and 2012 NDAA § 1021(c)(1)—not Article 118 of the Third Geneva Convention.[11]

### A.   Detention Operations at Guantanamo Bay Are Exempt From Army Regulation 190-8 Under the Exception Memorandum.

Nor can Petitioner seek enforcement of Article 118 via Army Regulation 190-8.  The Secretary of the Army ("SecArmy") has issued an authoritative memorandum excepting the detention operations at Guantanamo Bay from AR 190-8, a matter Petitioner fails to mention in his Petition. *See* Memorandum from Ryan D. McCarthy, Sec'y of the Army, to Commander, U.S. Southern Command, Re: Army Regulation (AR) 190-8 Clarification/Exception (January 11, 2021) ("Exception Memorandum") (attached as Exhibit 4).   In the Exception Memorandum, the SecArmy, drawing on the authority "to approve exceptions to" AR 190-8 "that are consistent with controlling law and regulation," AR 190-8 at *i*, "formally and explicitly except[s] the detention operations conducted by JTF-GTMO [Joint Task Force Guantanamo] from AR 190-8," and he also "make[s] clear that AR 190-8 is not applicable to any detainees held at JTF-GTMO." Exception Memorandum, ¶ 4. "This exception applies with respect to any and all claims— including pending claims—by JTF-GTMO detainees premised on AR 190-8." *Id.* The exception

---

[11] Whether the NDAA's use of the term, "end of hostilities," contemplates detention beyond that envisioned by Article 118's concept of "cessation of active hostilities," need not be decided in this matter because, as explained above, active hostilities continue.

forecloses application of AR 190-8 to JTF-GTMO detainees like Petitioner and, thus, precludes use of AR 190-8 as a vehicle for a claim under the Third Geneva Convention.[12]

The Exception Memorandum cites pertinent authorities and then provides that Army Regulation 190-8 "has not required and does not require that any of the detainees currently held at JTF-GTMO, all of whom are unprivileged belligerents being held in the context of the non-international armed conflict against al-Qaida and associated forces, be afforded prisoner of war status or treatment, including such treatment or protections on a provisional basis pending a status determination." *Id*. ¶ 3. Indeed, the Exception Memorandum properly describes the application of international and domestic law to this case. The Exception Memorandum traces the correct

---

[12] The memo was properly issued and, as explained in the text above, is otherwise consistent with existing law. The Secretary of the Army issued the memo in his capacity "as the promulgating official for AR 190-8 and the DoD Executive Agent under DoD Directive 2310.01E." SecArmy Memo 2. Indeed, the regulation identifies the Secretary as the lead official on whose authority the regulation issued. *See* AR 190-8 at i. As the regulation notes, the Secretary assigned responsibilities to the Deputy Chief of Staff for Operations and Plans as the regulation's "proponent," who "has the authority to approve exceptions to th[e] regulation that are consistent with controlling law and regulation." *Id*. But that assignment was perfectly consistent with the Secretary's authority. *See* 10 U.S.C. §§ 7013, 7031, 7032; *United States v. Hennis*, 75 M.J. 797, 804-05 (A. Ct. Crim. App. 2016), aff'd, 79 M.J. 370 (C.A.A.F. 2020). And "it is well established that the head of an agency retains the authority to make final decisions for the agency even if he or she delegates the authority to make these decisions to his or her subordinates." *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 9-10 (D.D.C. 2000) (citing *Knight v. United Land Ass'n*, 142 U.S. 161, 176-82 (1891)); *see also Morrow v. Clayton*, 326 F.2d 36, 45-46 (10th Cir. 1963) ("[T]he head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate under the supervision and direction of the superior or the power to administer is vested in the superior."). "To hold otherwise would create havoc in the administration of our laws." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1388 (5th Cir. 1979). *See generally* DoD Directive 2310.01E ¶¶ 1.c & 9.a (Sep. 18, 2020) (designating the Secretary as the Executive Agent "for the administration of the DoD Detainee Program" and for "DoD detainee operations policy"), available at https://perma.cc/N8ZL-T4AE; AR 190-8 at i ("implement[ing]" DOD Directive 2310.01E); *id*. at § 1-4(b) ("The Secretary of the Army is the DOD Executive Agent [] for administering the DOD EPW, CI and RP Program" in charge of "plan[ning] and develop[ing] the policy and coordinat[ing] the operation of the programs."); DoD Directive 5101.1 ¶ 4.4 (noting that an Executive Agent's "authority takes precedence over the authority of other DoD Component officials"), available at https://perma.cc/R3UL-JDPD.

relationship between AR 190-8 and the Third Geneva Convention, drawing further on the President's Determination that those who are part of al-Qaida are not entitled to prisoner-of-war privileges, Directive 23101.01E, and the Department of Defense Law of War Manual.

The United States' conflict with al-Qaida and associated forces is a non-international armed conflict. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 630-31 (2006); *see also* Exception Memorandum, ¶ 2 (citing *Hamdan*).  In such conflicts, the full protections of the Third Geneva Convention do not apply to members of non-State armed groups; rather article 3 of the Convention applies.  *See* Third Geneva Convention, art. 3.  The full protections of the Third Geneva Convention apply during international armed conflicts (*i.e.*, conflicts between opposing States) to persons who are afforded prisoner-of-war status or treatment, under Article 4, which defines prisoners of war, principally as (1) members of the armed forces of a state that is a party to the conflict as well as members of militias or volunteer corps forming part of such armed forces, and (2) members of other militias or volunteer corps belonging to a state that is party to the conflict that are commanded by a responsible superior officer, have fixed distinctive insignia, carry arms openly, and conduct their operations in accordance with the laws of war (*e.g.*, by refraining from conducting attacks that target civilians). *Id.* art. 4(A)(1) & (2).  And Article 5 extends provisional prisoner-of-war protection to enemy persons detained during such international armed conflicts, in cases of doubt about whether such persons belong to any of the categories of persons entitled to prisoner-of-war status, until their eligibility under Article 4 can be determined by a competent tribunal.

The Convention includes narrower protections for "armed conflict[s] not of an international character," id. at art. 3—in other words, conflicts "not involv[ing] a clash between nations," *Hamdan*, 548 U.S. at 630. States engaged in non-international armed conflicts must provide

detained enemy nonstate personnel with certain protections enumerated in Article 3, including that "[detained persons] shall in all circumstances be treated humanely." *See* Third Geneva Convention art. 3. But Article 3 does not require enemy nonstate personnel detained during non-international armed conflict to be treated as prisoners-of-war.

The Convention provides that, in conflicts between two or more High Contracting Parties, the full protections of the Convention will apply to the "mutual relations" of the High Contracting Parties that are participants, even if "one of the [other] Powers in conflict may not be a party to the present Convention." Third Geneva Convention, art. 2. "[T]he Powers who are parties" to the Convention shall "be bound by the Convention in relation to the said [non-party] Power, if the latter accepts and applies the provisions thereof." *Id.* But that provision is not applicable to Petitioner or other detainees excepted under the Exception Memorandum. Importantly, "[n]on-state actors" such as al-Qaida are not "'Power[s]' that would be eligible under Article 2 . . . to secure protection by complying with the Convention's requirements." *Hamdan v. Rumsfeld*, 415 F.3d 33, 44 (D.C. Cir. 2005) (Williams, J., concurring), *cited approvingly by Hamdan*, 548 U.S. at 630. Nor has al-Qaida accepted and applied the Convention's provisions. For example, unlike military forces that are entitled to enemy prisoner of war status and that obey the laws of war, al-Qaida "makes no distinction between military and civilian targets." *See The 9/11 Commission Report* xvi (2004). Indeed, President George W. Bush concluded in 2002, that, since al-Qaida is a terrorist organization, al-Qaida's fighters are unprivileged enemy combatants to whom the full protections of the Geneva Convention do not apply. *See* Presidential Memorandum, *Humane Treatment of al Qaeda and Taliban Detainees* (Feb. 7, 2002) (attached as Exhibit 12). Al-Qaida is not and cannot be a High Contracting Party to the Third Geneva Convention, nor are al-Qaida forces entitled to the full protections of the Convention, including prisoner of war status. The

Exception Memorandum, thus, correctly explains AR 190-8 "has not required and does not require that any of the detainees currently held at JTF-GTMO, all of whom are unprivileged belligerents being held in the context of the non-international armed conflict against al-Qaida and associated forces, be afforded prisoner of war status." Ex. 4 at 1.

Petitioner also does not fall into the category under AR 190-8 of "Other Detainee" entitled to provisional prisoner of war privileges.  Indeed, the Exception Memorandum explains that the "Other Detainee" definition in AR 190-8 does not extend prisoner of war status to Petitioner or others detained at Guantanamo Bay. The definition of "Other Detainee" provides that "[p]ersons in the custody of the U.S. Armed Forces who have not been classified as an" Enemy Prisoner of War, Retained Personnel, or Civilian Internee, "shall be treated as [Enemy Prisoners of War] *until* a legal status is ascertained by competent authority." AR 190-8, glossary, § II (emphasis added). This definition is part of the U.S. military's implementation of Article 5 of the Third Geneva Convention, which (as noted *supra*) extends provisional prisoner-of-war protection to enemy persons detained during international armed conflicts until their eligibility for prisoner-of-war status can be determined.

As an initial matter, it would be incongruous to interpret a provision for detainees to be treated as prisoners of war pending a status determination, to be a basis for release before such determination has been made.  More fundamentally, the process and interim status of "Other Detainee[s]" in the regulation are provided "[i]n accordance with Article 5" of the Third Geneva Convention.  AR 190-8 § 1-6(a).  And as noted, prisoner of war privileges are part of the full protections of the Third Geneva Convention that do not apply to members of nonstate armed organizations in this non-international armed conflict. *See supra* at 29.  Rather, the Convention entitles Petitioner to the humane treatment protections specified in Article 3.  The provisional-

treatment requirement, however, only applies in conflicts in which prisoner-of-war protections apply.[13] The United States' non-international armed conflict with al-Qaida is not such a conflict, as explained above, and the Exception Memorandum is consistent with that conclusion.

Further, in any event, Petitioner's "legal status" has already been "ascertained by competent authority," excluding Petitioner from the "Other Detainee" category.  *See* AR 190-8, glossary, § II.  As noted above, in 2002 the President concluded that since al-Qaida is a terrorist organization, al-Qaida's fighters are unprivileged enemy combatants to whom the full protections of the Geneva Convention do not apply.  So the provisional-treatment requirement in the AR 190-8's glossary's definition of "Other Detainee" does not extend prisoner of war treatment under AR 190-8 to Petitioner, who has been determined to be part of al-Qaida.[14]  *See Hamdan*, 415 F.3d at 43 (holding that the President is a competent authority to determine a detainee's legal status for purposes of AR 190-8), *rev'd on other grounds*, 548 U.S. 557 (2006); *United States v. Hamidullin*, 888 F.3d 62, 72-73 (4th Cir. 2018) (same).[15]

_____

[13] *See also* DoD Law of War Manual § 4.27.2 (June 2015; updated Dec. 2016) ("*During international armed conflict*, should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 of the GPW, such persons shall enjoy the protection of the GPW until such time as their status has been determined by a competent tribunal") (emphasis added), https://perma.cc/6X3J-Q2FS; U.S. Dep't of Def., Directive 2310.01E, ¶ 3(h) ("*During international armed conflict*, should any doubt arise as to whether a detainee belongs to any of the categories enumerated in Article 4 of Reference (d) [*i.e.*, the Third Geneva Convention] and as such is entitled to the protections and privileges afforded POWs, such detainees shall enjoy treatment as POWs until a tribunal convened in accordance with Article 5 of Reference (d), determines whether the detainee is entitled to such status or treatment.") (emphasis added).

[14] Even prior to this Court's determination in Petitioner's prior habeas case, *see supra* at 5-6, Petitioner was specifically determined to be an enemy combatant—that is, part of al-Qaida—by a Combatant Status Review Tribunal in 2005.  *See* Action Memo for Designated Civilian Officer from Convening Authority, Combatant Status Review Tribunal (Jan. 25, 2005) (attached as Exhibit 10); Combatant Status Review Tribunal Decision Report Cover Sheet (attached as Exhibit 11).

[15] Petitioner may attempt to argue that he falls within the "Other Detainee" category under AR 190-8 consistent with the ruling in *al-Qahtani v. Trump*, 443 F. Supp. 3d 116 (D.D.C. 2020), but reliance on that case would be infirm.  In that case, Mohammed al-Qahtani, another Guantanamo

*(footnote continued on next page)*

Finally, the Exception Memorandum is consistent with the holding and rationale of *Al Warafi v. Obama (Al Warafi II)*, 716 F.3d 627 (D.C. Cir. 2013). In that case, the petitioner claimed entitlement to release based on his assertion that he served as a medic or "medical personnel" within the scope of the First Geneva Convention.[16] The Court of Appeals, in the course of addressing Al Warafi's arguments, focused on "analysis" of "the relevant aspects of the Geneva Conventions that have been expressly incorporated into Army Regulation 190-8," because it is AR 190-8, and not the Geneva Conventions, that constitutes "domestic U.S. law." *Id.* at 629. The Court of Appeals also noted that "a detainee may invoke Army Regulation 190-8 to the extent that

---

detainee, filed a motion in his habeas action in 2017, asking the Court to use its All Writs Act authority to compel the Government to facilitate his examination by a Mixed Medical Commission, a medically related review reserved for prisoners of war under the Third Geneva Convention and AR 190-8. *See* 443 F. Supp. 3d at 121. Despite acknowledging that the Government had previously determined both that al-Qahtani was a member of al-Qaida, and that al-Qaida fighters are not entitled to prisoner of war status under the Convention, the District Court nonetheless concluded that al-Qahtani was an "Other Detainee" who must be treated as an enemy prisoner of war under AR 190-8 and thus receive a Mixed Medical Commission. *Id.* at 130.

*Al-Qahtani* should not be followed, however. The Court misunderstood the regulation as extending the Convention's privileges for prisoners of war to members of non-state terrorist organizations who do not qualify for prisoner-of-war status. The Court also did so without ever addressing the Convention's distinction between international and non-international armed conflicts or between the requirements of the Convention's Article 3 and prisoner-of-war privileges. As explained *supra* at 29-31, such an approach is erroneous. Further, the decision in *al-Qahtani* was issued almost a year before the SecArmy Exception Memorandum issued, and the case did not address, much less constrict, the authority of the SecArmy to except Guantanamo detainees from AR 190-8.

[16] As explained by the Court of Appeals,

> Article 24 of the Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (Aug. 12, 1949), 6 U.S.T. 3114 ("First Geneva Convention" . . .), directs that "staff exclusively engaged in the administration of medical units and establishments ... shall be respected and protected in all circumstances." Article 28 of the First Geneva Convention declares that "[p]ersonnel designated in Article[ ] 24 . . . who fall into the hands of the adverse Party, shall be retained only insofar as the state of health, the spiritual needs and the number of prisoners of war require."

716 F.3d at 629.

the regulation explicitly establishes a detainee's entitlement to release from custody." *Id.* at 629-30.  But the Court of Appeals in *Al Warafi* nowhere concluded that AR 190-8 requires that detainees be treated as prisoners of war under the Third Geneva Convention, nor did it, having been issued almost eight years prior to the Exception Memorandum, purport to address, let alone to constrict, the authority of the SecArmy to except Guantanamo detainees from AR 190-8.  The case does not supply a rule of law that is inconsistent with or that overrules the Exception Memorandum and related law.

Indeed, in the initial appeal by Al Warafi, decided by unpublished decision, the Court of Appeals *assumed—without deciding*—that the First Geneva Convention and AR 190-8 applied to Al Warafi's habeas claim in the case.  The District Court, according to the Court of Appeals, "did not explicitly address whether Al Warafi was permanently and exclusively medical personnel within the meaning of Article 24 of the First Geneva Convention and Army Regulation 190-8, § 3-15(b) (1)-(2), *assuming arguendo their applicability.*"  *Warafi v. Obama*, 409 F. App'x 360, 361 (D.C. Cir. 2011) (emphasis added).  The Court of Appeals remanded for the District Court "to consider (or reconsider) Al Warafi's argument he was permanently and exclusively engaged as a medic and to make a finding on this issue."  *Id.*  On remand, the District Court determined that Al Warafi had not met his burden to prove he was "medical personnel," and on appeal from that determination, the Court of Appeals affirmed by its published decision.  *Al Warafi II*, 716 F.3d at 628.  Because Al Warafi did not meet his burden on the factual question (whether he was exclusively engaged as a medic), there was no occasion for the Court of Appeals to *hold* that the First Geneva Convention (by way of AR 190-8) actually applied to Al Warafi's case. The *arguendo* assumption remained just that—an assumption.  Thus, *Al Warafi* did not speak to or address the

issue in this case concerning whether Petitioner could properly appeal to AR 190-8 to obtain treatment as a as prisoner of war or seek release under the regulation.

Accordingly, for the reasons stated above, the Exception Memorandum, and the law, preclude Petitioner from attempting to use Article 118 of the Third Geneva Convention or provisions of AR 190-8 that help implement Article 118 as a basis for seeking immediate release. Petitioner, thus, also cannot rely on the line of cases associated with *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), to argue administrative noncompliance on the part of Respondents with AR 190-8.

## III.  THE LEGALITY OF PETITIONER'S DETENTION IS NOT UNDERMINED BY THE TASK FORCE'S DESIGNATION OF CERTAIN YEMENI DETAINEES FOR CONDITIONAL DETENTION

Petitioner also errs in arguing that, because he was among a group of Yemeni detainees recommended for "conditional detention," *see supra* at 6-7, he "thus necessarily could not be subject to continued detention under the AUMF" and that his continued detention violates Executive Order 13, 492.  Pet. ¶¶ 5, 111-112.  While Petitioner is correct that the Task Force identified certain detainees (including Petitioner himself) that "pose a lower threat than the group of detainees designated for continued detention under the AUMF," Ex. 6, Task Force Report at 25, it does not follow from the Executive Order or the Task Force designation of Petitioner thereunder that Petitioner is not lawfully detained under the AUMF.

As an initial matter, to the extent Petitioner's claim is based on the Executive Order, the Executive Order specifically provides that "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."  Exec. Order 13,492, Section 8(c).  Petitioner, accordingly, cannot assert a claim under the Order.

As a general matter, executive orders are viewed as management tools for implementing the President's policies, and not as legally binding documents that may be enforced against the Executive Branch.  *See In re Surface Mining Regulation Litig.*, 627 F.2d 1346, 1357 (D.C. Cir. 1980); *see also*, *e.g.*, *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1338-39 (4th Cir. 1995); *Facchiano Constr. Co. v. U.S. Dep't of Labor*, 987 F.2d 206, 210 (3d Cir. 1993); *Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 236 (8th Cir. 1975).  Here, the plain language of Executive Order 13,492 demonstrates an intent not to create the private right on which Petitioner depends.

The Court of Appeals has regularly found that such language is dispositive and forecloses a private right of action.[17]  Applying that precedent, another Judge in this District found that a Guantanamo detainee's asserted "right to be free" could not "be grounded in" Executive Order 13,492 because "its terms" expressly stated that it did not "create any right or benefit."  *Ahjam v. Obama*, 37 F. Supp. 3d 273, 280 (D.D.C. 2014) (rejecting challenge to statutory prerequisites to transfer of Guantanamo detainees).[18]  For the same reason, Petitioner cannot ground a claim in the Executive Order in this case.

---

[17] *See Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013) (Executive Order 12,866, requiring the FAA to conduct cost-benefit analyses, contained similar language and therefore did not confer private rights that could be sued upon); *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 688-89 (D.C. Cir. 2004) (Executive Order 12,898, requiring an environmental-justice analysis, "expressly stat[ing] that [it did] not create a private right to judicial review" could not form the basis for the suit); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (finding that similar language in Executive Order 12,893, requiring cost-benefit analysis for infrastructure projects, "is not subject to judicial review"); *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not, for instance, subject to judicial review.").

[18] Judges on this Court have made similar findings in other contexts based on express language in Executive Orders disclaiming any private right of action. *See*, *e.g.*, *Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014); *Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120-21 (D.D.C. 2011); *Alliance for Natural Health v. Sebelius*, 775 F. Supp. 2d 114, 135 n.10 (D.D.C. 2011); Res. Def. Council v. U.S. Dep't of State, 658 F. Supp. 2d 105, 108 (D.D.C. 2009).

Nor does Petitioner's effective designation as eligible for transfer undermine the legality of his detention.  Indeed, Petitioners' argument ignores the meaning of his designation as eligible for transfer under certain conditions.  Such a designation does not render continued detention unlawful; rather, it was based on an assessment of the detainee's threat and reflected a judgment that "any threat posed by the detainee can be sufficiently mitigated through feasible and appropriate security measures in the receiving countr[ies]," Ex. 6, Task Force Report at 17.  *See Almerfedi v. Obama*, 654 F.3d 1, 4 n.3 (D.C. Cir. 2011) ("whether a detainee has been cleared for release is irrelevant to whether a petitioner may be lawfully detained"); *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010) ("[w]hether a detainee would pose a threat to U.S. interests if released is not at issue in habeas corpus proceedings in federal courts concerning aliens detained under the authority conferred by the AUMF"); *id*. ("the United States's authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released but rather *upon the continuation of hostilities*") (emphasis added).  *Accord* Task Force Report at 17 (explicitly denying that designation as eligible for transfer established detainee's detention was unlawful); *al-Wirghi v. Obama*, 54 F. Supp. 3d 44, 47 (D.D.C. 2014) (designation for transfer does not reflect a decision that the detainee poses no threat or render continued detention unconstitutionally arbitrary); *cf. Paracha v. Biden*, No. 04-cv-2022 (PLF), 2022 WL 2952493, at *6-*7 (D.D.C. July 26, 2022) (holding that detainee's designation as eligible for transfer based on threat assessment under Periodic Review Board process established by Executive Order 13,567 did not entitle detainee to habeas writ).

This Court previously found that Petitioner is lawfully detained under the AUMF as "part of al-Qaida," *see Al-Bihani v. Obama*, 2010 LEXIS 107590 (D.D.C. Sept. 22, 2010), thereby justifying his continued law-of-war detention while hostilities against al-Qaida and associated

forces remain ongoing; those hostilities remain ongoing, as discussed *supra*. Accordingly, Petitioner remains lawfully detained.

## CONCLUSION

For the foregoing reasons, Petitioner is not entitled to relief and his Petition for a Writ of Habeas Corpus, ECF No. 1, should be denied in its entirety.


Dated: December 16, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

TERRY M. HENRY
Assistant Branch Director

/s/Alexander N. Ely
ALEXANDER N. ELY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Washington, DC 20005
Tel: (202) 993-5177; Fax: (202) 616-8470
alexander.n.ely@usdoj.gov

*Counsel for Respondents*

38

## **CERTIFICATE OF SERVICE**

I certify that on December 16, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants.

/s/ Alexander N. Ely
Alexander N. Ely

*Counsel for Respondents*